```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
DENNIS F. GROSS, M.D., AND M/D    :
SKIN CARE LLC,
                                  :

                 Plaintiffs,      :

                                  :
       -against-                  :            OPINION
                                  :       03 Civ. 3089 (RLC)
BARE ESCENTUALS BEAUTY, INC., MD  :
FORMULATIONS, INC. F/K/A          :
BIOCEUTIX, INC., AND BARE         :
ESCENTUALS BEAUTY, INC. F/K/A MD  :
BEAUTY, INC.,                     :

                                  :
                 Defendants.      :
_____X
BARE ESCENTUALS BEAUTY, INC. AND  :
MD FORMULATIONS, INC.,            :

                                  :
             Counterclaimants,    :

                                  :
       -against-                  :

                                  :
DENNIS F. GROSS, M.D., AND M/D    :
SKIN CARE LLC,                    :

                                  :
          Counterdefendants.      :

                                  :
-----------------------------------X
```

APPEARANCES

MORRISON COHEN LLP
Attorneys for Plaintiffs
909 Third Avenue
New York, NY 10022

                    FRED H. PERKINS
                              Of Counsel




LATHAM & WATKINS LLP
Attorneys for Defendants
600 West Broadway, Suite 1800
San Diego, CA 92101

                    JENNIFER L. BARRY
                              Of Counsel




ROBERT L. CARTER

Currently before the court is defendants' motion for partial summary judgment on defendants' first and fourth counterclaims for relief, and plaintiffs' motion for summary judgment on the first claim for relief and the first, second, and fourth counterclaims for relief.[1]  For the reasons herein, the court grants defendants' motion for summary judgment on the first and fourth counterclaims, and denies plaintiffs' motion for summary judgment on the first claim for relief, and the first, second, and fourth counterclaims for relief.

## BACKGROUND

The court assumes familiarity with the defendants and plaintiffs in this lawsuit.

The MD Formulations line is a skincare system owned by defendants.  See Miles Decl. ¶ 3.  Defendants advertise their products by getting featured in beauty and fashion magazines. See Miles Decl. ¶ 7.  For example, they have been featured in Lucky fashion magazine and Allure beauty magazine.  See Miles

---

[1] Plaintiffs originally filed a motion for summary judgment on their first claim for relief, and on defendants' first through ninth counterclaims for relief.  Because the parties stipulated to the withdrawal of the third, sixth, and seventh counterclaims, and the court granted defendants' motion to withdraw the eighth, and ninth counterclaims, the court has ignored the portions of plaintiffs' submissions that address these claims.  Additionally, plaintiffs' first claim for relief and defendants' first counterclaim for relief deal with the same issue of whether plaintiffs' actions constitute trademark infringement.  As such, the court addresses plaintiffs' first claim, which requests declaratory judgment that they have not engaged in trademark infringement, by addressing defendants' motion for summary judgment on their first counterclaim that seeks relief for trademark infringement.  Finally, the court will address plaintiffs' remaining claim for summary judgment, on defendants' fifth counterclaim, in a separate opinion.

Decl. ¶ 7, Exh. 1.  The line is sold in retail stores such as Sephora, Ulta, mdformulations.com website, and Bare Escentuals boutiques.

As a prestige skincare brand, the MD Formulations products are priced higher than mass market skincare products.  See Barry Decl. ¶ 2, Exh. 1 at 95: 2-7 (describing the differences between mass market products and prestige skincare products).  For example, a one ounce jar of MD Formulations Critical Care Skin Repair Complex costs $100.00.[2]  See Miles Decl. ¶ 6.

MD Formulations' current trade dress resulted from of a rebranding effort that began in late 1999.  The line is packaged in boxes of various sizes and shapes that are metallic gray on the top and white on the bottom, and most have a thin line of color separating the two colors.  See Barry Decl. ¶ 3, Exh. 2. This line of color may be red, blue, orange, or fuchsia, depending on the type of product.  The new trade dress has been in use for over five years.  The MD Formulation logo is on the first line of printing on the package, written horizontally, in lowercase letters and no punctuation, i.e. "md formulations."

Defendants own and use the following trademarks: 1) "M.D. Formulations," 2) "MD Formulations Vit-A-Plus," and 3) the stylized "MD Formulations" (collectively "MD Formulations marks").  See Barry Decl. ¶ 8, Exh. 7.  The first two were used

---

[2] This price point reflects the price at the time the parties' documents were originally submitted to the court.

for five consecutive years after their registration and are still in use, and are thus incontestable.  <u>See</u> 15 U.S.C. § 1065. The MD Formulations stylized marks were registered May 8, 2002.

When referring to their products, several of defendants' employees have referred to them as "MD," despite Staci Wilson's, Senior Vice President of Bare Escentuals, dislike of the practice. <u>See</u> Wilson Tr. 42-43.  Employees of defendants also referred to MD Formulations as "MDF" and/or "MDF Skincare."  <u>Id.</u>

Plaintiff Dennis F. Gross is a well-known dermatologist based in New York City.  <u>See</u> Second Am. Compl. ¶ 1.  He is the principal founder and co-owner of MD Skincare LLC, a New York limited liability company with its principal place of business in New York City.  <u>Id.</u> at ¶¶ 2-3.  MD Skincare formulates, sells, and markets skin treatment products in the United States and internationally.  <u>Id.</u> at ¶ 2.  Dr. Gross owns, and MD Skincare uses the following trademarks: 1) M.D. Skincare, 2) M.D. Skin Care, and 3) MD Skincare Dr. Dennis Gross (stylized), (collectively "MD Skincare marks").  <u>Id.</u> at ¶ 3.

MD Skincare products are sold through several retailers, including Sephora, Nordstrom, the mdskincare.com website, and through spas and salons.  <u>See</u> Barry Decl. ¶ 11, Exh. 10.  Like MD Formulations, MD Skincare is a prestige skincare line with price points similar to that of MD Formulations.  For example, a

1.7 ounce jar of MD Skincare Hydra-Pure Intense Moisture Creations costs $120.  Id.

Dr. Gross was aware of the MD Formulations trademarks when he adopted MD Skincare for his products line.  Barry Decl. ¶ 14-15, Exhs. 13, 14.  He originally considered the name "MD Formula" but finally settled on MD Skincare as the company's name.  Id.  However, Mary Leber, Gross's sales consultant and business manager, told Gross that the name MD Skincare was too similar to MD Formulations.  See Barry Decl. ¶ 17, Exh. 16 at 53:25-55:22.  Dr. Gross believed that they could use the MD Skincare name without infringing on any trademarks as long as it was in the immediate vicinity of Dr. Gross's name.  Id. at ¶ 10, Exh. 9.

In 2001, the MD Skincare line underwent a rebranding and orange was included as a primary color in the design.  See Carrie Gross Tr. at 83.  The resulting package design was white, metallic gray, and orange.  The logo was redesigned to all lowercase letters and no periods in the bolded "MD," i.e. "md skincare."  The name, Dr. Dennis Gross, appeared in a smaller font beneath the MD Skincare logo.  The redesigned products reached retail outlets in late 2003.  In May 2002, plaintiffs filed a trademark application for their new stylized logo, "M.D. Skincare Dr. Dennis Gross."  Barry Decl. ¶ 21, Exh. 20.

In early 2003, defendants contacted plaintiffs, claiming that plaintiffs' use of the "MD Skincare" marks infringed upon the "MD Formulations" marks owned by defendants.  See Barry Decl. ¶ 11, Ex. L.  Plaintiffs initiated this lawsuit on May 1, 2003, seeking declaratory judgment that the "MD Skincare" marks were not infringing on defendants' trademarks.  Compl. ¶¶ 7-25.  The lawsuit was dismissed for lack of jurisdiction, and plaintiffs appealed.  In the interim, defendants commenced two actions in the Northern District of California, alleging trademark infringement of their "MD Formulations" marks and seeking a preliminary injunction.  No preliminary injunction was issued, and defendants agreed to withdraw and waive any objections to this court's personal jurisdiction over them for the purposes of this lawsuit.

On January 20, 2006, plaintiffs filed an amended complaint in the lawsuit.  Plaintiffs seek relief on the following grounds in the second amended complaint:  1) declaratory judgment that defendants do not have exclusive use of the mark "MD;" 2) relief because defendants  allegedly infringed upon the "Alpha Beta" mark; 3) relief because defendants' alleged infringement was a violation of federal unfair competition law; 4) cancellation of the "MD" marks; 5) relief under common law unfair competition; and 6) relief because defendants allegedly violated New York General Business Law section 349.  Defendants answered the

second amended complaint, asserting several counterclaims: 1)
statutory and common law trademark infringement; 2) unfair
competition; 3) trade dress infringement; and 4) cancellation of
the "Alpha Beta" marks.

## DISCUSSION

Summary judgment is granted to the moving party "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law." F.R. Civ. P. 56(c). "Only when no reasonable
trier of fact could find in favor of the nonmoving party should
summary judgment be granted." White v. ABCO Eng'g Corp., 221
F.3d 293, 300 (2d Cir. 2000)(quoting Taggart v. Time, Inc., 924
F.2d 43, 46 (2d Cir. 1991)). The court's role is to determine
whether there is a genuine issue for trial, not to weigh the
evidence and determine the truth of the matter. See Jewish
Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d
340, 343(E.D.N.Y. 2007)(Dearie, J.)(citations omitted). Thus,
district courts must resolve all factual ambiguities and draw
all reasonable inferences in favor of the nonmoving party. See
Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002)(citing Cronin
v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995)).

**1.  Summary Judgment on Defendants' First Counterclaim and Plaintiffs' First Claim**

Defendants' first counterclaim[3] for relief alleges that plaintiffs are infringing on the "MD Formulations" trademark, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1),[4] by using "MD Skincare" on their professional products.

To prevail, defendants must prove that plaintiffs have 1) without consent, 2) used in commerce, 3) a copy, colorable imitation, or reproduction of a protectable mark, as part of the sale or distribution of goods, and 4) that such use is likely to create customer confusion.  See 15 U.S.C. § 1114(1)(a).  The first two factors are not in dispute.  Plaintiffs' product line,

---

[3] Plaintiffs' first claim for relief requests declaratory judgment that they have not engaged in the conduct alleged in defendants' first counterclaim. The court is treating the first claim and the first counterclaim as one claim, as the disposition of one necessarily disposes the other.

[4] In relevant part, Section 32 of the Lanham Act states the following:
"(1) Any person who shall, without the consent of the registrant--

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided."

15 U.S.C. § 1114 (1).

"MD Skincare," was created without defendants' permission and was used in the sale of goods.  Thus, defendants must prove: "(1) that their trademark is protectable and (2) that the defendant's mark is likely to confuse consumers as to the source or sponsorship of its product." Playtex Prods. Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 161 (2d Cir. 2004).  Because a determination of the likelihood to confuse consumers test is closely related to a determination on the protectability of the trademark, we turn to the likelihood to confuse test first.

### A.  Polaroid Factors

When determining the likelihood of confusion between two marks, courts consider: (1) the strength of the plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) actual consumer confusion between the two marks; (6) the defendant's intent in adopting the mark;(7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group.  See Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000) (citing Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961))(emphasis added).

Where the predicate facts are beyond dispute, the evaluation of these factors is a question of law for the court.

See Nabisco, 220 F.3d at 46.  No single factor is dispositive; "the ultimate question of whether consumers are likely to be confused" is the primary focus for the court.  See Playtex Prods. Inc., 390 F.3d at 162.

### (1) Protectability and Strength of defendants' mark

When evaluating the strength of a mark, courts look at its "inherent distinctiveness" and "acquired distinctiveness." The inherent distinctiveness of a mark also determines its protectability.  The scale of inherent distinctiveness, listed from least to most:  "(1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful."  TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc., 244 F.3d 88, 93 (2d Cir. 2001) (citations omitted).

Generic marks are marks "consisting of words that identify the type or species of goods or services to which they apply, [and] are totally lacking in distinctive quality. . . ." TCPIP Holding Co., 244 F.3d at 93.  Generic marks are never protectable.  "A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put." Lane Capital Mgmt. Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999).  Descriptive marks are generally unprotectable but may be protectable where they acquire "secondary meaning."  See Playtex Prods. Inc., 390 F.3d at 163.

A mark is suggestive "if it requires imagination, thought and perception to reach a conclusion as to the nature of goods." Abercrombie & Fitch v. Hunting World, Inc._, 537 F.2d 4, 11 (2d Cir. 1976)(citations omitted).  "Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." Star Indus., Inc. v. Bacardi & Co. Ltd.**,** 412 F.3d 373, 385 (2d Cir. 2005).  A determination of the inherent distinctiveness of a mark also addresses its protectability.

Because the issue of the marks' classification, or inherent distinctiveness, also answers the question of protectability, the court addresses both issues together. The protectability of a mark is a factual question, viewed from the perspective of the purchasing public.  See Lane Capital Mgmt. Inc., 192 F.3d at 344.  A certificate of registration with the Patent and Trademark Office is prima facie proof that the mark is protectable.  Id. at 345.  Because the MD Formulations marks were registered, used for five consecutive years thereafter, and are still in use, they are incontestable.  See 15 U.S.C. § 1065.

Plaintiffs argue that defendants' marks are not protectable because defendants merely contest the use of "MD," a generic term.  They argue that because they are not using defendants' "MD Formulations" mark in its entirety, only the "MD" portion of the mark should be considered when determining its

protectability.  Defendants counter that the marks should be
compared in their entirety when determining their
distinctiveness.

Plaintiffs' attempt to reduce defendants' marks to the
generic component of "MD" is unsuccessful.  "The long-standing
view that the nongeneric components of a mark must be compared
in the context of the overall composite mark. . .remains the
rule in this Circuit."  See Banff, Ltd. V. Federated Dep't
Stores, Inc., 841 F.2d 486, 491 (2d Cir. 1988).  In Playtex, the
owners of the "Wet Ones" trademark, a moist towelettes
manufacturer, sued their competitors, for the use of "Moist
Ones" as their product name.  See Playtex Prods. Inc., 390 F.3d
at 163.  The court did not disassemble the mark to compare them.
Instead, the court looked at each mark in its entirety and made
a determination based on the "overall composite mark."

Plaintiffs further contend that "MD Formulations" is
generic because it describes a product that is a formulation for
doctors.  This is a misrepresentation of the type of goods in
question – skincare products.  Furthermore, even in defendants'
misguided attempt to categorize a prestige skincare line as a
formulation for doctors, it does not seem likely that "MD
Formulations" is a generic term for the genus of products for
doctors.

13

Defendants' "MD Formulations" marks pertain to their prestige skincare product line and do not conjure the image of a skincare product.  It is not a term that "identif[ies] the type or species of goods or services to which they apply," and thus is not generic.  TCPIP Holding Co., 244 F.3d at 93.  It requires imagination to relate "MD Formulations" to skincare products, thus their marks are suggestive in nature.  MD Formulations "could plausibly describe a wide variety of products."  See Playtex Prods. Inc., 390 F.3d at 163. The court finds that "MD Formulations" is not only a protectable mark, but is inherently distinctive.  It thus satisfies the first prong of the Lanham Act requirements, and the first element of determining the marks' strength.

The second step is to determine the marks' acquired distinctiveness, which refers to "recognition plaintiff's marks has earned in the marketplace as a designator of plaintiff's good or services."  Brennan's, Inc. v. Brennan's Rest. LLC, 360 F.3d 125, 131 (2d Cir. 2004).  All of the MD Formulations marks are incontestable trademarks.  Defendants' products have grossed $45 million in the past five years, been featured in numerous fashion magazines, received considerable press coverage, and have been in use since 1992.[5]  Their incontestability and defendants' lengthy use of the mark bolster its strength.  The

---

[5] This is the date of registration for the MD Formulations stylized trademark. See Defs. Amended First Counterclaim.

acquired distinctiveness coupled with the inherent distinctiveness of their suggestive mark, indicates that defendants' marks are strong.

**(2) *The proximity of the parties' products in the marketplace.***

Both products are "prestige" skincare products and are "in similarly described distribution channels, including retail stores, salons and spas, and the Internet." Pls. Memo in Opp at 37. They are similarly priced and are sold at some of the same retail locations, such as Sephora and Ulta. There is proximity where consumers who buy the alleged infringer's products "are reasonably likely to visit nearby retail stores where [plaintiff's products]. . . are sold, creating the opportunity for confusion." Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 218 (2d Cir. 2003). Since the products are sold in some of the same retail outlets, this factor weighs in defendants' favor.

**(3) *Actual consumer confusion between the two marks***

"Actual consumer confusion" means "consumer confusion that enables a seller to pass off his goods as the goods of another." Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 963 (2d Cir. 1996)(citations omitted). Although no single factor in the Polaroid test is dispositive, evidence of actual confusion is given particular weight. See Virgin Enters. Ltd. v. Nawab,

335 F.3d 141, 151 (2d Cir. 2003)("It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion.  We have therefore deemed evidence of actual confusion 'particularly relevant' to the inquiry.")(citations omitted).  Substantial evidence of actual confusion, by itself, is enough to support a finding of trademark infringement.  See, e.g., Morningside Group Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133, 143 (2d Cir. 1999).

Inquiries about affiliation alone are not enough to find "actual confusion."  See Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001).  That consumers may question the affiliation of the two competitors is not evidence of actual confusion.  Id.  By contrast, in a later case, evidence of consumers inquiring about whether the defendant's products were affiliated with plaintiff's products is evidence of actual confusion that weighed in plaintiff's favor.  See Virgin Enters, 335 F.3d at 151.

These two cases are in direct conflict with one another regarding the relevance of affiliation inquiries.  Although the court is of the view that inquiries about affiliation suggest that there is confusion, there is no need to decide which

precedent to follow.[6]  There is ample evidence to support a
finding of actual confusion.

"Although anecdotal evidence is admissible to establish
actual consumer confusion,. . .it is within a district court's
broad discretion to rule upon the admissibility of those
anecdotes." See Nora Beverages, Inc., 269 F.3d at 124.
Plaintiffs argue that defendants' evidence of actual confusion
is irrelevant, inadmissible hearsay.  However, most of the
instances of consumer confusion that the defendants have
presented are either not being offered for the truth of the
matter asserted or fit within a hearsay exception, and thus are
admissible hearsay.

The court has sufficient accounts of actual confusion, that
are admissible under the Federal Rules of Evidence.[7]

*Confusion Involving Plaintiffs' Interaction with Customers*

---

[6] It is worth noting, however, where there has been conflicting case law
regarding a point of law, the Second Circuit has adopted the most recent case
law.  Playtex Prods. Inc., 390 F.3d at 161. (adopting the standard of review
expressed in the court latest decision where there was a conflict between the
later standard of review and an earlier standard of review that the court
adopted).  The court is of the opinion that Nora is no longer the governing
law regarding inquiries about affiliation, however, the court need not reach
the issue in this case because there is ample evidence of confusion that does
not involve inquiries about affiliation.  Assuming that Nawab is the
appropriate precedent regarding inquiries about affiliation, defendants'
voluminous accounts regarding these inquiries provide additional support for
finding that there is actual confusion in this case.

[7] This is not an exclusive list of accounts of actual confusion, but rather, a
list of convincing instances of actual confusion.  In total, defendants have
listed sixty incidents in which there was product confusion.  It is not
necessary to detail those incidents because the listed items in this decision
are ample anecdotal evidence of confusion.  Furthermore, plaintiffs have
failed to specifically identify and explain their evidentiary objections
regarding the following accounts, therefore the court will not specify why
they are admissible under the Federal Rules of Evidence.

- On November 7, 2005, plaintiffs received a message from a customer sent through the MD Skincare website:  "I use MD Formulations cleanser (I assume that is a related product), and like it very much. . . ."

- On July 25, 2005, plaintiffs received a message from a customer sent through the MD Skincare website:  "I was introduced to your products when I bought [] [defendants'] Bare Minerals kit. . . ."

- On December 10, 2004, plaintiffs received a message from a customer sent through the MD Skincare website:  "I have used the makeup for 3 years and just started using the skin care line i love it. . . ."  Plaintiffs do not offer makeup products, and the customer was likely referring to defendants' products.

- On November 7, 2005, plaintiffs received a message from a potential spa customer sent through the MD Skincare website:  "we would love to receive some information about retailing MD formulation [sic] and using it at the spa."

- On September 26, 2005, plaintiffs received an email from the beauty editor of Fashion magazine: "I noticed that here, the MD Formulations line has no orange on the packaging; it's just gray and white.  Do you know why?"  Plaintiff responded, "We are actually MD Skincare.  MD

Formulations is an entirely different line altogether. . . The similarity in the brand names often causes Confusion [sic]. . ."

- Laura Montry, an Account Executive for MD Skincare from May 2005 to May 2006, experienced confusion on several occasions while visiting spa and salon customers, including customers asking her for information about MD Formulations, and referring to MD Skincare as MD Formulations.

- Nicole Johnson, a Trainer for MD Skincare from April to September 2005, experienced confusion during her visits to spa, salon, and retail customers, including customers thinking that the product lines were the same or related.

- Catherine Schones, an Account Coordinators/Executive for MD Skincare since July 2005, experienced confusion in fall of 2005 when she was approached by a customer in a Nordstrom. While discussing the MD Skincare products, a customer commented that she loved the MD Skincare glycolic wash. Schones understood the customer to be referring to the MD Formulation glycolic cleanser, as MD Skincare does not produce this product.

- Ginger Machado, an Account Coordinator for MD Skincare from January to April 2005, testified that she believes that the trademarks are confusingly similar based on her experiences interacting with customers.

*Confusion Involving Defendants' Interaction with Clients and Stores*

- Irene Howland, an Account Executive for defendants, has had conversations with spa and salon staff and customers that reflect actual confusion.  On one occasion, an aesthetician asked Howland, "aren't the products the same," in reference to the MD Skincare and MD Formulations products.

- Melissa Hahn, the former Director of International Sales for defendants, visited Nordstrom in Seattle on September 3, 2005, and asked whether the store carried MD Formulations products, whereupon the salesperson said yes and pointed to a display of MD Skincare products.

These eleven incidents involve employees of both parties. In addition, defendants have presented consumer surveys indicating that consumers are seemingly confused about the source of the MD Skincare products.  Dr. Itamar Simonson[8] conducted the survey at eight shopping malls in October 2006. Two hundred and eleven interviews were completed, and after validation, the net sample was 210 respondents.  The survey targeted "prospective purchasers of premium skincare products."

---

[8] Dr. Simonson holds a Ph.D. in Marketing from Duke University, Fuqua School of Business, and an M.B.A. from the UCLA Graduate School of Management.  He is an experienced survey expert, having conducted, supervised, or evaluated over 1,000 marketing research studies.  See Barry Decl. ¶ 40, Exh. 38.

Potential respondents qualified for the survey if they spent more than $50 per month on cosmetic skincare products.

Prospective purchasers first looked at and examined three products made by MD Formulations; in a separate room they viewed and examined three products made by MD Skincare, dr. brandt, and N.V. Perricone M.D. (placed in random order).  The latter two products acted as controls.  After viewing the products, the prospective consumers were asked questions including: 1) whether they thought that any of the products in the first room were the same as any of the products in the second room, 2) whether they thought any of the companies that made the products in the second room had a business connection with the company that made the products in the first room; and 3) whether they thought that any of the companies that made the products in the second room had permission or approval from the company that made the products in the first room.  Dr. Simonson concluded that the net confusion level was 34.5 percent.

Plaintiffs have cross-moved to exclude this evidence, arguing that it does not satisfy any of the requirements for admitting expert testimony.  Pursuant to Rule 702 of the Federal Rules of Evidence, the trial court ensures that proffered expert testimony is both relevant and reliable.  See Daubert v. Merrell Dow Pharms. Inc., 509 U.S. 579, 589 (1993).  In order to be probative of the issue of actual confusion, the Simonson

consumer survey, must "have been fairly prepared and its results directed to the relevant issues." See Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 741 (2d Cir. 1994). The following factors are relevant when determining the admissibility of survey evidence:  1) whether the universe was properly defined; 2) whether a representative sample of the universe was selected; 3) whether the questions to be asked of the interviewees were framed in a clear, precise, and non-leading manner; 4) whether sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose of the survey; 5) whether the data gathered was accurately reported; 6) whether the data was analyzed in accordance with accepted statistical principles; 7) whether the objectivity of the entire process was ensured. See Schering Corp. v. Pfizer Inc., 189 F.3d 218, 225 (2d Cir. 1999). "A survey is only inadmissible if its flaws destroy all of its relevance." Conopco, Inv. V. Cosmair, Inc., 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999).  Plaintiffs contest the admissibility of the survey on several grounds.

First, plaintiffs argue that the survey was in the wrong universe because $50 is "too low to capture prestige purchasers."  See Pls. Cross-Motion at 45.  As plaintiffs sell several products that are *below* the fifty dollar threshold, their argument is without merit.  The Simonson survey involved

the appropriate universe by targeting consumers who spend fifty dollars or more on skincare products. Fifty dollars each month is a total of six hundred dollars spent on skincare products in one year.  A consumer who purchased one $75 product every two months, or $32.50 monthly, belongs to the market that plaintiffs targets, yet plaintiffs would have the court find that this consumer is not within the "prestige" universe.

Plaintiffs further argue that consumers should have been selected based on the retail locations where they make their purchases, e.g., Sephora or Ulta.  The survey questioned respondents on whether they purchased skincare products from Sephora; 56 of the 210 respondents answered yes.  Thus, more than a quarter of the respondents are relevant under plaintiffs' own definition of the proper universe using this metric.  The confusion rate was 34.5%, and when looking solely at those consumers who shopped at Sephora, it jumped to 47%.  Controlling for specific retail locations does not buttress plaintiff's argument that there was no actual confusion.

Additionally, plaintiffs argue that the survey is unreliable because it did not use an approved format.  However, the survey design is nearly identical to a methodology Professor McCarthy has cited as a "properly conducted survey."  See 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:177.  It was the line-up survey method; "respondents are

shown the plaintiff's trade dress, and then, after a short delay, shown a line-up of other brands, including the accused product.  Respondents are asked if any of them are made by the same company as makes the product initially seen." Id. The Simonson survey uses the same methodology as that described by McCarthy, the court thus finds that an approved format was used.

Plaintiffs further contend that the survey is unreliable because it did not use proper controls and products, and showed only the outer package of the products.  They argue that defendants should have controlled for the generic aspects of the mark, such as the word "MD" or the color orange. When evaluating trademark infringement, "[a] court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember." Lang v. Retirement Living Publ'g Co., 949 F.2d 576, 581 (2d Cir. 1991).  Following this approach, it is clear that defendants need not control for the confusion caused by "MD," and for the other "generic" aspects of the marks.  The overall impression left by the marks is what is important.

Next, plaintiffs argue that the survey is unreliable because it does not control for the trade dress and trademark infringement aspects of the products.  Defendants counter that there were both trademark and trade dress infringement claims, which create less concern about the failure to identify the

trademark and trade dress elements that create confusion separately.  However, there are aspects of the trade dress that are separate from the trademark, and the failure to address these differences is a flaw in the survey.  However, this flaw is not fatal, as it does not deprive the study of all relevance. Conopco, Inc., 49 F. Supp. 2d at 253. The issue is whether there is a likelihood of confusion, and the survey is relevant to this question.

Finally, plaintiffs argue that the survey is irrelevant. This is not the case as the survey measures the likelihood of confusion between the two products in question.  It goes to the heart of the issue at hand, and is highly relevant.  Plaintiffs' argument about relevance is without merit.

The consumer survey evidence indicates that there is a 34.5% confusion rate, or using plaintiffs' approach, a 47% confusion rate.  This substantial rate of confusion, coupled with the numerous anecdotal accounts of confusion, indicate that there was actual consumer confusion.  This factor is sufficient to establish that there is a likelihood of confusion.

### (4)  *The similarity of the parties' marks*

The stylized logo of both defendants' and plaintiffs' marks is confusingly similar.  When evaluating the similarity of marks, courts do not make a "side-by-side comparison" of the marks.   See Louis Vuitton Malletier v. Dooney & Bourke, Inc.,

454 F.3d 108, 117 (2d Cir. 2006).  Instead, courts compare the
marks' similarities "when viewed sequentially in the context of
the marketplace."  Id.  The focus is on confusing similarity,
not on whether the marks are identical.  See Sports Auth., Inc.,
89 F.3d at 962-63.

In 2003, MD Skincare adopted a logo that with the brand
name in lowercase sans serif letters, and with the "M.D." in
bold with no periods after the letters, i.e., "md skincare."
Plaintiffs argue that the court must look at its "md skincare
Dr. Gross" in its entirety.  Even looking at the mark as such,
they are similar.  "Dr. Gross" appears in small font underneath
the "md skincare" in plaintiffs' products.  In this way, the
marks appear quite similar when one looks at "md skincare" and
"md formulations" sequentially; they appear in similar fonts and
stylization, and with Dr. Gross's name appearing in small font
under "md skincare." That "skincare" is an entirely different
word than "formulations" is not dispositive in determining
confusing similarities. See Louis Vuitton Malletier, 454 F.3d at
117 (requiring district court to reconsider its determination
that marks are not similar simply because the marks "LV" and
"DB" are not identical).  It is the overall impression created
by the marks that determines similarity. Id.

Moreover, plaintiffs have admitted that the two marks are
so similar as to cause consumer confusion.  Barry BE Infrin. MSJ

Decl. Para 25, Exh. 24 at DG01701 (email from plaintiffs stating, "The similarity in the brand name often causes confusion.").  The evidence of consumer confusion presented in the Simonson survey and proximity of the products in the market place provide additional evidence for the marks' similarity. They prove that "when viewed sequentially in the context of the marketplace" the parties' marks are confusingly similar.  For the aforementioned reasons, the court finds that the similarity factor is in defendants' favor.

### (5) *Other Factors.*

The court now considers the sophistication of the relevant consumers.  "The greater the value of an article the more careful the typical consumer can be expected to be. . ."  See McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1137 (2d Cir. 1979); see also Girogio Beverly Hills, Inc. v. Revlon Consumer Prods. Corp., 869 F. Supp. 176, 185 (S.D.N.Y. 1994)(Duffy, J.)("[I]t has been acknowledged that women tend to be sophisticated purchasers of perfume.").  The parties sell "prestige skincare" products, which are high end cosmetics. There is little direct evidence regarding consumer sophistication, price is the only evidence regarding this element, and it weighs in plaintiffs' favor.

The remaining factors are neutral.  First, the parties have set forth no evidence regarding the "bridge the gap" factor, thus the court considers this factor neutral.

Next, although there is some evidence that plaintiff was aware of defendants' mark when they selected theirs, it is insufficient to prove that the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and any confusion between his and the senior user's product and thus done in bad faith.  See Edison Bros. Stores, Inc. v. Cosmair, Inc., 651 F.Supp. 1547, 1560 (S.D.N.Y. 1987)(Stanton, J.).

Finally, both products are part of the high end skincare market, and neither party has presented evidence that one product is of substantially higher quality than the other. Consequently, this factor is also neutral.

### 6)Balancing of the Polaroid factors

Given that there is considerable evidence of actual consumer confusion, the marks are confusingly similar, there is proximity in the market place, and the MD Formulations marks are strong, the balancing of the Polaroid factors weighs in defendants' favor.  As such, summary judgment is granted in defendants' favor in their first counterclaim for relief, and against plaintiffs' in their first claim for relief.

**2. Summary Judgment on Defendants' Second Counterclaim**

In their second counterclaim for relief, defendants present a false designation of origin claim against plaintiffs in violation of 15 U.S.C. section 1125(a).  The elements for proving false designation in this context are identical to the elements required to prove trademark infringement under 15 U.S.C. section 1114. See Sports Auth. Inc., 89 F.3d at 960; Rosenthal A.G. v. Rite Lite, 986 F. Supp. 133, 139 (E.D.N.Y. 1997)("Both [claims of trademark infringement under 15 U.S.C. § 1114(1) and false designation of origin under 15 U.S.C. § 1125(a)] require proof of essentially the same elements.").  The court has resolved the trademark infringement claim in defendants' favor; however, defendants have failed to move for summary judgment on this claim. The court recognizes that it may grant summary judgment sua sponte, as long as at least one party has moved for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). However, the defendants have expressly opted to not move for summary judgment on their false designation of origin claim. Def.'s Mot. Opp'n Summ. J. 59 (stating that it would be "improper" for the court to grant summary judgment in defendants favor). Consequently, plaintiffs' motion for summary judgment on the defendants' second counterclaim is simply denied.

**3.   Summary Judgment on Defendants' Fourth Counterclaim**

In their fourth counterclaim for relief, defendants argue that plaintiffs' infringed upon their trade dress in violation of the Lanham Act, 15 U.S.C. § 1125.   Defendants must establish that the overall design and appearance that make its packaging identifiable to consumers is (1) protectable and (2) there is likely consumer confusion as to the source of defendants' products.   Nora Beverages, Inc., 269 F.3d at 118.   Trade dress is protectable if it is either inherently distinctive or has acquired secondary meaning in the marketplace, and it is nonfunctional.   Id. at 118.   The multi-factor Polaroid test is applied to evaluate the likelihood of consumer confusion after protectability of the trade dress is established.

(1) *Protectability and Strength of defendants' trade dress*

When assessing the protectability of a trade dress, courts apply the generic, descriptive, fanciful, and arbitrary classifications used for assessing trademarks.[9]   However, "[b]ecause manufacturers and retailers have a 'virtually unlimited' choice of packaging and labeling materials available to them, most packaging trade dress is arbitrary, fanciful, or suggestive."   See Nora Beverages, Inc., 164 F.3d at 743.   "If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or

---

[9] A discussion of each of these classifications is above in the court's discussion about the trademark infringement claim.

descriptive elements." <u>Paddington Corp. v. Attiki Importers & Distributors, Inc.</u>, 996 F.2d 577, 584 (2d Cir. 1993).

Defendants' trade dress is a "md formulations" printed in lowercase without punctuation; this mark appears on the top printed line on each product; a color scheme of white and metallic gray, with a thin horizontal stripe of color often separating those two colors. There is no product-related reason for defendants to have chosen this trade dress. The trade dress is arbitrary; there is nothing about this scheme that is descriptive or suggestive of what the product is.

Comparison of its packaging with the other designs used by the defendants' competitors is useful for determining the distinctiveness of the trade dress. <u>See Fun-Damental Too, LTD v. Gemmy Industries Corp.</u>, 111 F.3d 93, 1000 (2d Cir. 1997)("A trade dress that. . .conforms to a well-established industry custom is generic and hence unprotected."). Defendants' competitors sell skincare products in cartons of various sizes, shapes, and colors and use countless different fonts, symbols, and logos. Barry Decl. 44-45, Exh. 42-43.

The burden is now on plaintiffs to establish that defendants' trade dress is functional, but not protectable although it is an arbitrary trade dress. <u>See Lesportsac, Inc. v. Kmart Corp.</u>, 754 F.2d 71, 76 (2d Cir. 1985). Plaintiffs must show that aspects of defendants' trade dress are "essential to

the use or purpose of the article" or "affect costs or quality."
See Landscape Forms Inc. v. Columbia Cascade Co., 70 F.3d 251,
253 (2d Cir. 1995).  Plaintiffs are unable to meet this burden.
Nothing about defendants use of lowercase, unpunctuated "md
formulations," or their use of white and metallic gray color
schemes on their packaging is "essential to effective
competition" in the skincare market.

The court now directs its attention to the strength of
defendants' trade dress.  "The strength of a particular mark or
dress is measured by its distinctiveness or the degree to which
it indicates the source or origin of the product." Bristol-
Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1044 (2d
Cir. 1992)(citing McGregor-Doniger, 599 F.2d at 1131; Banff,
Ltd. v. Federated Dep't Stores, 841 F.2d 486, 491 (2d
Cir.1988)).  The trade dress has been in use since 2001.
Defendants have spent considerable time, effort, and resources
advertising their brand and getting it featured in beauty and
fashion magazines.  Miles Decl. 7-8.  Defendants have grossed
more than $45 million in the past five years.  Furthermore,
their trade dress is inherently distinctive as an arbitrary
trade dress.  See Miles Decl. 7-8. For these reasons, the trade
dress is strong.

(2) *Similarity with the defendants' trade dress*

When determining similarity between the trade dresses, the issue is "whether the similarity between the two trade dresses will contribute to consumer confusion as to the origin of the product." Bristol-Myers, 973 F.2d at 1046.   The court must determine whether the trade dresses "create the same general overall impression." RJR Foods v. White Rock Corp., 603 F.2d 1058, 1060 (2d Cir. 1979).  However, plaintiffs appear to use several trade dresses for their products; one of which prominently features orange.  In fact, the orange portion of the carton occupies the majority of the carton.  For these cartons, there is little similarity.  The following analysis applies to those cartons that are primarily composed of white or gray.

The parties' trade dresses share several common elements: both use boxes that are mostly metallic gray and white;[10] both use the same shade of metallic gray (PMS 877); both have their logos on the first line of printing, written horizontally; and similar style logos, i.e. md skincare and md formulations.

---

[10] Neither party has clearly specified whether the cartons with orange most prominently displayed are at issue for the trade dress infringement action. The court resolves this ambiguity in favor of plaintiffs and finds that defendants' trade dress infringement claims concern cartons that prominently feature white or gray, i.e., boxes where orange is merely an accent line under "md skincare."  In their description of plaintiffs' trade dress, defendants describe it as having orange as an "accent color," providing support that defendants' trade dress claim does not apply to carton with orange prominently featured.  See Defs. Motion in Supp. First and Fourth Claims, at 7 ("The result of. . .[plaintiffs'] rebranding was a package design using white and metallic gray with orange as an accent color.").  The court only concerns itself with cartons that use orange as "an accent color" that separates the white and metallic gray portions of the carton, not those with orange in prominent display on the carton or lids of the carton.

Plaintiffs argue that this description does not factor in the appearance of the individual carton of their products. Because defendants have stated that they are only disputing the appearance of the trade dress on the outer carton of plaintiffs' products, the court will only consider the elements of the outer carton of the products.  While the parties' trade dress is not identical, the similarities in the appearance in the parties' packaging are significant, especially since their products are sold through the same channels of trade.  See Fun-Damental Too, 111 F.3d at 1003 ("Despite some variation between the individual elements of the trade dress…the overall effect of the parallel use of multiple elements supports the finding of substantial similarity.").  The orange is merely an accent color and the similarity between the marks coupled with the same metallic gray and white box, renders the trade dresses confusingly similar.

Moreover, as indicated in the court's analysis under the trademark infringement claim, evidence of actual confusion indicates that the products are indeed confusingly similar. Consequently, this factor weighs in defendants' favor.

(3) *Other Polaroid Factors*

The court will not repeat its analysis of the remaining Polaroid factors.  For the same reasons articulated above, evidence of actual confusion and proximity in the market place weighs in defendants' favor; the sophistication of the consumers

34

in plaintiffs favor; and the bridge the gap and bad faith elements are neutral.

(4)*Balancing of the Polaroid Factors*

Given that defendants' trade dress is strong, the trade dresses are confusingly similar, there is proximity in the market place, and there is actual consumer confusion, the balancing of the Polaroid factors weighs in defendants' favor. Summary judgment is granted in defendants' favor in their fourth counterclaim for relief, and against plaintiffs' motion for summary judgment on defendants' fourth counterclaim for relief.

**4. Rejection of Plaintiff's Defenses**

**A.   Unclean Hands**

Plaintiffs claim that defendants are not entitled to relief because of the equitable doctrine of unclean hands.  This defense "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co., 324 U.S. 806, 814 (1945).  Plaintiffs point to defendants' conduct in obtaining a mark with "MD" in its name, distributing in non-aesthetician retail channels, and referring to themselves as "MD" and "MDF."  For the reasons above and articulated in the court's prior decision in this case, this conduct was not misconduct, and plaintiffs have not proved any

fraud or deceit on the defendants' part.  Plaintiffs' unclean
hands defense is without merit.

**B.  Laches**

Plaintiffs claim that the laches defense is applicable to
defendants' counterclaims because defendants delayed for more
than four years before objecting to plaintiffs' use of MD
Skincare.  "Laches is an equitable defense which bars injunctive
relief where a plaintiff unreasonably delays in commencing a
lawsuit." Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.,
17 F.3d 38, 44 (2d Cir. 1994).  There is a presumption against
laches where the lawsuit was initiated within the applicable
statute of limitations.  See Conopco, 95 F.3d at 191.  Since
there is no statute of limitation in the Lanham Act, courts
apply the analogous statute of limitations from the forum state.
See Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc., 88 F.
Supp. 2d 188, 196 (S.D.N.Y. 2000) (Hellerstein, J.). New York's
analogous state statute is the six-year statute of limitations
for fraud.  Id. (citing Conopco, Inc., 95 F.3d at 191).
Defendants initially filed a lawsuit against defendants on July
1, 2003, this is well within the six-year statute period.

When the lawsuit is filed within the statute of
limitations, the party claiming the laches defense must prove:
1) the claimant inexcusably delayed in bringing the claim; and
2) the defendant was prejudiced by the plaintiffs' delay.  See

36

Leisure Time, 17 F.3d at 44. Defendants objected to plaintiffs'
use of the MD Skincare marks in 2003.  The letter came less than
two years after plaintiffs were issued registrations for their
marks and prior to when their rebranded trade dress appeared in
stores.  They began the formal litigation process against
defendants on July 1, 2003.  Defendants brought their claims
within the statute of limitations, within a reasonable time
frame.  Under these circumstances, it is clear that defendants
did not inexcusably delay in bringing their claims. For these
reasons, plaintiffs' laches defense is without merit.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary
judgment, pursuant to Rule 56 of the Federal Rules of Civil
Procedure, is granted as to the first claim and the fourth
counterclaims.[11]  Plaintiffs' motion for summary judgment is
denied as to the first claim for relief, and the first, second,
and fourth counterclaims for relief.

**IT IS SO ORDERED**

DATED:     New York, New York
           November 19, 2008



                              **ROBERT L. CARTER**
                              **U.S.D.J.**

---

[11] The court's decision regarding the trade dress infringement claims is
limited to the trade dress of the outer cartons of plaintiffs' products with
orange as an ''accent color,'' and not with orange in prominent display.